207 N.J. Super. 63 (1985)
503 A.2d 912
JAY B. CONEY, JR. PLAINTIFF,
v.
HENRIETTA (COOMBS) CONEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division Camden County, Family Part.
Decided July 24, 1985.
*66 Rocco T. Santora, for plaintiff.
Raymond S. Nadel, for defendant.
GLADDEN, J.S.C.
This matter came on for final hearings which were held on April 23, May 9, and May 23, 1985 for divorce and equitable distribution of property. The court, having heard all the evidence, as well as having reviewed the exhibits in evidence, now makes the following findings of fact:
Plaintiff and defendant have known each other most of their adult lives. They began to date during the 1960's, at which time they were still married to, but separated from their former spouses. In 1968 plaintiff rented a property in the Parkside section of Camden, New Jersey and he and defendant, together with her two children, ages 6 and 4, moved into it. They lived there for about a year, at which time he rented a part of a duplex property in West Berlin, New Jersey. This location was near his employment and was also near Chesilhurst, a community which was familiar to both parties. Plaintiff was working steadily as a trucker and defendant was collecting public assistance for her children.
At that time, both parties were in the process of obtaining divorces. Both were interested in locating in Chesilhurst and began negotiations with a builder known as Charles Homes, Inc. Plaintiff reviewed the plans submitted for their home with his employer, John DiMeglio. The agreement was that they would purchase the lot from Charles Homes, who would also provide the shell for the home. The arrangements with Charles Homes called for the parties to take care of clearing some *67 trees, providing the excavation and foundation for the shell, and finishing the building to their own taste. The agreement was reached and settlement was had thereon in November 1971.
By the time of settlement, defendant had already obtained a divorce from her former spouse, but plaintiff's action was still pending. Therefore, title was taken in defendant's name alone, and she executed a mortgage for $16,000 to complete the settlement.
The court finds as a fact that it was plaintiff's funds that were used to provide the down payment and other settlement costs. Defendant claimed at the trial that her former father-in-law had given her $2,000, $1,000 for each of the children, and she had used these funds for the down payment and settlement costs, but there was absolutely no proof or details thereon. On the other hand, she did not deny that plaintiff was working steadily and that he had made it a practice to turn over all his earnings to her and she took care of the banking and determined which checking accounts she would use for payment of bills. After settlement was held, plaintiff's employer arranged with a friend of his in the construction business named Sam Rinker to assist plaintiff in clearing some trees from the lot, making excavation and pouring the foundation for the shell, for a good price. After the shell was in place plaintiff finished the property with some help from friends of his. Plaintiff paid the contractor and he and defendant and her two children moved in.
After about a year, they decided to build a driveway and plaintiff purchased the materials therefor and built it. During the next several years, the parties continued to improve their property. These improvements consisted of having a recreation room and fireplace built. To finance these improvements, the parties obtained the funds from a finance company, making application therefor as husband and wife, although they were not yet married. They later acquired the contiguous lot which plaintiff cleared of trees and built a parking area for his truck.
*68 During this period of time, plaintiff's divorce became final and the parties continued, as they had previously, living together as a family unit with plaintiff working steadily and defendant taking care of the home and working on her education. She had acquired her high school equivalency degree and in 1968 began to take courses at the Camden County Community College. She graduated in 1974 and continued at Glassboro State Teacher's College, as it was then known, and earned a bachelor of arts degree in 1977. She was then certified by the New Jersey Board of Examiners to teach on the nursery and elementary school levels.
All during this period, defendant continued to maintain the family finances, as she had always done, including the payment of the mortgage on the Chesilhurst property, which she would sometimes pay from one of his accounts and sometimes from her account. Eventually, she obtained employment with the Board of Education of the Borough of Lawnside, where she made approximately $125 to $135 a week, plus the public assistance that she was obtaining. She went off that assistance in 1977. In November 1978 the parties married and they continued to live in the property as a family unit, exactly as they had prior to their marriage. The parties installed underground electricity on their property and the contiguous lot to provide for floodlights for the property and electricity for the plaintiff's tractor.
In 1984, the parties began to have marital difficulties. At that time plaintiff had one checking account that he used for business only and for which he never gave the defendant the authority to sign his name. Plaintiff began to manage all accounts, including paying the bills, in 1983 after defendant failed to pay taxes owed. Nevertheless, in July 1984 she wrote a check for $3,000 without asking him, and used the proceeds to pay for some items for her children and her own medical bills for psychiatric treatment, as well as for attorneys fees for the present litigation.
*69 It should be noted that at the trial defendant took the position that plaintiff did not live with her "on a full time basis." Her testimony was that he was a "visitor" and he may have stayed with her three or four days in any given week. She claimed that defendant actually lived elsewhere. Her proof of this point however, was very unsatisfactory. Whereas, plaintiff's proof that he, in fact, lived there full time with defendant was overwhelming. This included not only his testimony, but the testimony of his employer, who knew him and who helped him in his efforts to obtain the marital property and to get it built. This employer had called plaintiff many times relating to work problems and on some of those occasions he would talk to defendant. In addition, plaintiff had many records, including his business records, drivers licenses, registrations, tax returns, loan documents, etc., all of which showed his address to be the marital home. The court finds as a fact that plaintiff lived in the marital home on a full time basis and that any overnight absences were due to his trucking business.
The complaint for divorce was filed in September 1984. Plaintiff testified as to the various acts of extreme cruelty committed by defendant against him, as detailed in paragraph four of his complaint, in subparagraphs A through G. These acts began about March 1984 and continued into that summer. There was no cross-examination of plaintiff with regard to this testimony. The court finds that the acts complained of constitute extreme cruelty as it is defined under our statutes and cases decided thereunder, and that such acts endangered his psychological health and physical health and made it unreasonable to expect plaintiff to continue to cohabitate with defendant. The court will, therefore, sign a judgment in favor of plaintiff based upon that ground for divorce.
The court now turns its attention to a troublesome question regarding equitable distribution of certain property. The principal question in this case is whether plaintiff has any remedy *70 for his interest in the real property known as 315 Fourth Avenue, Chesilhurst, New Jersey and the contiguous lot.
Defendant maintains that since these properties were acquired in her name alone prior to their marriage, that they are exempt from equitable distribution. Plaintiff contends otherwise and says that if it is not subject to equitable distribution then some other theory of law should provide a remedy. Our equitable distribution statute, N.J.S.A. 2A:34-23, gives the court the power
to effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially acquired by them or either of them during the marriage.
If this statute applies to this case, the court must find that the property in question was acquired "during the marriage." As our Supreme Court pointed out in Painter v. Painter, 65 N.J. 196 (1974), that language appears to be clear on its face, that is, that it commences as soon as the marriage ceremony has taken place and, reading the act literally, it ends the day the judgment of divorce is granted. That phrase in question however, is not defined in the statute and our courts have taken the position that where language of a statute is not specifically defined, the courts are free to interpret it.
For example, N.J.S.A. 2A:14-2 provides that actions for personal injuries must be brought within two years from the date of the injury. However, when the court was faced with a case in which plaintiff did not discover his injury for a period of time after it had occurred the Court did not hesitate to say that it had the power to interpret the language in accordance with the circumstances of the case, and declared the rule to be that where plaintiff did not know of his injury and could not have been reasonably expected to know it at the time it occurred, then the two-year statute of limitations would not begin until the actual learning of it or when he should have reasonably known about it. Fernandi v. Strully, 35 N.J. 434 (1961); Lopez v. Swyer, 62 N.J. 267 (1973); Moran v. Napolitano, 71 N.J. 133 (1976).
*71 In the Painter case the Court decided that, although the literal reading of the equitable distribution statute would indicate that the terminal point of a marriage is the day that the judgment of divorce is granted, the Court nevertheless decided that a better rule, for the purpose of determining what property would be eligible for distribution, should be deemed to be the date that the complaint is filed. In declaring the date of the filing of the complaint to be the rule, the Court recognized that the literal interpretation of the statute presented practical obstacles, and therefore, judicially declared a different termination date than when the statute seems to demand. A few years later the Supreme Court decided Smith v. Smith, 72 N.J. 350 (1977). In that case the parties had executed a property settlement agreement prior to the complaint and the Court in that case modified the Painter decision to provide that where parties in a divorce have entered into a formal separation agreement and had actually separated, the marriage would be deemed to have terminated as of the date of the formal separation agreement.
Thus, the above cases show that our courts have not hesitated to redefine the term "during the marriage" of the equitable distribution statute, at least so far as determining the termination of the marriage by judicial decision. So far, this court has found no reported decision in this State where the court has had to determine that "during the marriage" necessarily and arbitrarily began on the date of the marriage ceremony. If our courts are to determine that the beginning date for the purpose of equitable distribution under the statute may be some date other than the date of the ceremonial marriage, then the court may have to consider various premarital situations in which one party or both parties have acquired either certain rights or personal and real property. In examining cases in this State, with regard to various fact situations, it appears that the rights of parties or property acquired by them fall into the following three classifications.
*72 1) Non-marital property, that is, that property which the party seeking equitable distribution had nothing to do with prior to the marriage, either by way of funds or services. There are two reported decisions in New Jersey that come within this classification. In the first case, Mol v. Mol, 147 N.J. Super. 5 (App.Div. 1977), defendant-husband brought real property into the marriage which he acquired prior to the marriage and to which plaintiff had contributed nothing. The court held that while the property itself was not subject to equitable distribution, any increase in the value of the property, which plaintiff or which plaintiff and defendant contributed to during the marriage, would be distributable. That case cites Painter v. Painter, supra, and Scherzer v. Scherzer, 136 N.J. Super. 397 (App.Div. 1975), certif. den. 69 N.J. 391 (1976).
In the second case, Griffith v. Griffith, 185 N.J. Super. 382 (Ch.Div. 1982), the facts were essentially the same as Mol, except for the real estate in question which was mortgaged and had been paid down during the marriage. The court held that the mortgage principal pay-down was subject to equitable distribution.
2) Cohabitation property, that which arises out of cohabitation of the parties, not followed by a marriage, has been discussed in Kozlowski v. Kozlowski, 80 N.J. 378 (1979). That was a case where plaintiff did cohabit with defendant for a period of 15 years in exchange for his agreement to support her for the rest of her life ("palimony"). The parties then separated and never married. Although the Court held that plaintiff was not entitled to alimony or equitable distribution because these are marital remedies only, it did approve the trial court's award to plaintiff of a one-time lump sum judgment based upon breach by defendant of his agreement to support plaintiff for life. The Court also approved of the philosophy expressed in Marvin v. Marvin, 18 Cal.3d 660, 669, 134 Cal. Rptr. 815, 557 P.2d 106 (Sup.Ct. 1976), that such support agreements by adult non-married partners which are not explicitly and inseparably founded on sexual services are enforceable. This holding by the *73 Supreme Court was generally confirmed in the case of Crowe v. DeGioia, 90 N.J. 126 (1982) where the parties also cohabitated, but never married. Plaintiff filed her complaint in the Chancery Division and sought pendente lite relief including alimony. The Supreme Court affirmed that the remedy of alimony may be only awarded in matrimonial actions of divorce or nullity, hence, was not available in this case. It did affirm, however, other pendente lite relief that had been granted by the trial court, on the basis that it was necessary to prevent irreparable harm. The Court found this harm because plaintiff was threatened with the loss of her home of 14 years and her only means of support. Although her claims did not fit the conventional category of matrimonial actions, relief could nevertheless be granted in applying traditional equitable principles in order to achieve substantial justice and the Supreme Court recognized the broad power of the trial judge to mold such relief.
3) Pre-marital property, occurs where one or both marital parties acquired either personal or real property jointly and made contribution to the same before marriage. This theory rests on the proposition that property so acquired was in "contemplation of marriage" and therefore subject to equitable distribution.
This case appears to fall within the third classification above, that is, property acquired by both parties during a premarital period of cohabitation, followed by marriage. For the same reasons that the Supreme Court has given in Painter, supra, and other cases for judicially changing the time when a marriage ends in its interpretation of the words "during the marriage," this court is able to judicially determine when a marriage begins for the purpose of interpreting that phrase. Just as Painter noted that interpreting the act literally and determining that the terminal point would be the date that the judgment of divorce is granted would present practical obstacles, so also in a given set of facts, reading the act literally to determine the beginning point, presents practical obstacles. *74 The case at bar is very similar to the unreported Sullivan case, supra. The only difference is that the parties cohabitated in the case at bar and apparently did not in Sullivan.
I find that the real property in this case was indeed acquired in contemplation of marriage. That contract was not expressed but certainly implied by all of the actions of the parties, Kozlowski v. Kozlowski, supra, 80 N.J. at 384, 391. From the time that they began to cohabit, when they lived together in Camden and later in West Berlin, and certainly when they planned to purchase the lot and build a home in Chesilhurst, every action of the parties was consistent with their implied contemplation of marriage. They lived together with her children. He worked steadily and turned his pay over to her and she handled the finances, ran the household and reared her children. This continued after they obtained the property in Chesilhurst, and eventually defendant attended college and got her degree and began working in the teaching field. At that point in time, the parties married, which, in fact, carried out what they had always intended. That being so, the real property in question is equitably distributable under our statute.
But even assuming that the property is not equitably distributable under the statute, there are other remedies available under the facts of this case to achieve the same result. These remedies may be stated as (1) resulting trust, (2) constructive trust, (3) quantum meruit, (4) quasi-contract, and (5) transmutation.
The court may impose a resulting trust where one party purchases property with consideration furnished in whole or in part by the other party with the intention by the title holder to hold the title in trust for the party providing the consideration. D'Ippolito v. Castoro, 51 N.J. 584, 588-89 (1968). The constructive trust theory, the quasi-contract theory, *75 and quantum meruit theory are not based upon any actual intent of the parties, but are arbitrarily imposed by the court to prevent an unjust enrichment. Kozlowski, supra, 80 N.J. at 390, 391; D'Ippolito, supra. Justice Pashman, in writing the concurring opinion in D'Ippolito, discussed the availability of these remedies, where cohabiting parties did not marry, as follows:
The question which remains is whether quasi-contractual and equitable remedies should also be available to the parties upon dissolution of their relationship. Most unwed persons who choose to cohabit likely do so `in ignorance of the (financial) consequences of either marriage or non-marriage' and `with absolutely no thought given to the legal consequences of their relationship.' Bruch, `Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers' Services', 10 Family L.Q. 101, 135 (1976). Consequently, an agreement such as is here present may not exist in the vast majority of cases. Given this circumstance, it would be unwise to require some form of contract as a prerequesite to relief in the courts. Rather, we should presume `that the parties intend(ed) to deal fairly with each other' upon dissolution of the relationship, Marvin, supra, 18 Cal.3d at 683, 134 Cal. Rptr. at 830, 557 P.2d at 121, and consequently, in the absence of agreement, `employ the doctrine of quantum meruit, or equitable remedies such as constructive or resulting trusts' in order to insure that one party has not been unjustly enriched, and the other unjustly impoverished, on account of their dealings, id., 18 Cal.3d at 665, 134 Cal. Rptr. at 819, 557 P.2d at 110. See, e.g. Hewitt [v. Hewitt], supra [62 Ill. App.3d 861], 20 Ill.Dec. [476] at 481-482, 380 N.E.2d [454] at 459-460 [(4th Dist. 1978)]. [at 390-91]
There appears to be no reason why such equitable remedies, which are available to parties who cohabitated but did not marry, are not also available to those parties who ultimately married, as in the case at bar.
Transmutation is another judicially created doctrine where the courts are willing to go beyond the basic stricture of statutory classification of separate and marital property, where the strictures would lead to inequitable results. According to this theory, property that once was classified as separate or non-marital can be transmuted into marital property when the spouse with title represents to the other spouse that the property will be shared. In re Marriage of Smith, 86 Ill.2d 518, 529, *76 56 Ill.Dec. 693, 698, 427 N.E.2d 1239, 1244 (Sup.Ct. 1981); Kenney v. Kenney, 220 Cal. 134, 30 P.2d 398 (Sup.Ct. 1934). For an exhaustive review of cases on this subject in the country, see "The Relevancy of Premarital Cohabitation to Property Division Awards in Divorce Proceedings: An Evaluation of Present Trends and a Proposal for Legislative Reform," 63 B.U.L.Rev. 105 (1983).
Defendant suggests that this court declare the property to be non-marital and plaintiff's remedy limited to the mortgage pay-down, as set forth in Griffith, supra. Without question, such a result would be grossly inequitable to plaintiff and result in an unjust enrichment to defendant. If the equitable distribution statute does not apply to the facts of this case, the court will impose the equitable remedies to avoid that result.
In determining the extent of plaintiff's interest in the realty, the court must consider the factors outlined in Painter and other cases and not arbitrarily divide the property evenly. Wadlow v. Wadlow, 200 N.J. Super. 372, 377 (App.Div. 1985); Gibbons v. Gibbons 174 N.J. Super. 107, 114 (App.Div. 1980), rev'd on other grounds 86 N.J. 515 (1981). In this case the parties acquired the property specifically for family purposes and used it as such for some 14 years. Both made substantial contributions thereto during that time. The court feels that the property here should be equally divided. The value as of the filing of the complaint has been stipulated at $41,000, and the mortgage balance at $6,290, leaving a net equity of $34,710. There was testimony that although defendant's two children are now grown and emancipated, her daughter has just given birth to a child and has returned to defendant. Therefore, the court will give defendant the option to buy plaintiff's interest of $17,355 plus or minus any adjustment as are hereinafter set forth, to be exercised by defendant, giving plaintiff written notice thereof on or before November 1, 1985. In the event such option is not so exercised, it shall lapse and unless the parties agree otherwise, the property shall be promptly listed *77 and sold with the net proceeds divided equally, plus or minus the adjustments noted above. If the option is exercised, then settlement thereon shall take place on or before December 31, 1985.
Concerning the parties' vehicles, the parties own a 1978 Mack cab truck and a 1982 Chevrolet, which are subject to equitable distribution. Both parties submitted appraisals on the truck with plaintiff's appraisal setting the value as of the filing of the complaint at $11,500 and defendant's appraisal setting a value of $13,000. The court accepts the $13,000 valuation and since there are no encumbrances, that amount is subject to equitable distribution. I find that plaintiff has maintained and repaired this asset with relatively little assistance from defendant and therefore the court orders that plaintiff retain this asset and awards a credit to defendant of 30% of said value or $3,900. No appraisals were furnished for the 1982 Chevrolet, therefore the court will award that vehicle to defendant without any credit to plaintiff.
There is a certificate of deposit at the Heritage Bank dated June 1984 in the amount of $10,640.78, payable in June 1987. The interest of 11% is paid monthly. Again, the court finds that both parties contributed to the purchase of this certificate and orders that it and the interest be divided equally, whenever it is cashed in.
Most of the furniture had been acquired by defendant before their cohabitation, except the bedroom set, kitchen set, TV and stereo. In the event that the parties cannot agree on the division of the latter items, the court orders them sold and the proceeds equally divided.
The next issue concerns possible alimony for defendant. Plaintiff is 46 years old, a high school graduate, and has enjoyed relatively good health. He has been in the trucking business for most of his adult life and has always earned a relatively good salary. His 1984 tax return shows taxable *78 income, after business deductions, of approximately $24,000. For the first six months of 1985 his gross income figures are slightly less than the comparable figures for 1984.
As noted before, defendant was able to obtain a college degree and her teaching certificate during the period of cohabitation prior to the marriage and she has been working in the teaching field. Her 1984 tax return shows an approximate taxable income of $17,800. She is now 43 years old and in relatively good health.
The court feels, after considering all the facts and considerations of this case, that some rehabilitative alimony should be paid and the court orders plaintiff to pay to defendant the sum of $200 a month for a period of three years.
Plaintiff's counsel is directed to submit a judgment consistent with this opinion.